UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

JONATHAN JOSEPH GOOD, et al.,

                    Plaintiffs,                     Case No. 2:21-cv-18

                                                    Hon. Hala Y. Jarbou
v.

HEIDI WASHINGTON, et al.,

                    Defendants.
_____/

## ORDER DENYING PRELIMINARY RELIEF & FOR SEVERANCE

This is a civil rights action brought under 42 U.S.C. § 1983 by seven state prisoners housed at the Chippewa Correctional Facility.  Plaintiffs seek a temporary restraining order, which the Court will deny.  In addition, Rule 21 of the Federal Rules of Civil Procedure provides that, on motion by a party or on its own motion, the Court may at any time drop or add parties or sever a claim on grounds of misjoinder.  *Id.*  Applying that standard, the Court will sever the claims of each Plaintiff into a new related action.

## Discussion

### I.     Factual Allegations

The following seven Plaintiffs presently are incarcerated with the Michigan Department of Corrections (MDOC) at the Kinross Correctional Facility (KCF) in Kinchloe, Chippewa County, Michigan:  Jonathan Joseph Good; Derek Danford, Timothy M. Minnie; Martenez Wise; Johnnie Burkett; Joei Jordan; and JD Robinson.  The events about which they complain occurred at that facility.  Plaintiffs sue MDOC Director Heidi Washington, MDOC Assistant Deputy Director Joan Yukins, and Warden Mike Brown.

In their amended complaint, Plaintiffs allege that Defendants demonstrated deliberate indifference to their risk of contracting COVID-19.  They allege that Defendants were well aware of the risk to prisoners caused by the SARS Cov-2 virus due to the "pole barn" setting at KCF.  (Am. Compl., ECF No. 3, PageID.101.) According to Plaintiffs, Defendants ignored measures recommended by the Centers for Disease Control (CDC) and Governor Whitmer's executive orders by not imposing more rigid protocols, such as placing prisoners at adequate distance, conducting regular monitoring on rounds by health care personnel, and providing sanitizer to prisoners.  Plaintiffs also allege that Defendants failed to enforce the protocols they actually established and thereby unreasonably exposed Plaintiffs to the virus.  Defendants allegedly did not adequately monitor and test officers, did not provide sanitizer to prisoners, did not provide adequate cleaning and sanitizing supplies or implement adequate cleaning practices, and did not adequately increase the spacing between prisoners.  Plaintiffs contend that, until October 2020, KCF had no reported cases of COVID-19.  Shortly thereafter, however, Defendants' unreasonable actions ostensibly led to Plaintiffs contracting the disease.

With respect to the lack of adequate cleaning, Plaintiffs specifically allege that, in November 2020, a prisoner who is not a plaintiff, Trinity Nelson, was required to use a phone that potentially infected prisoners had already used, without an intervening cleaning.  (*Id.*, PageID. 107; Aff. of Trinity Nelson, ECF No. 3-7, PageID.154.)  Plaintiffs contend that Washington and Brown have failed to set out adequate protocols for the cleaning of frequently touched surfaces. They allege that PC McDowell (who was subsequently diagnosed with COVID-19) touched the door and went to the dining hall, but the areas were not cleaned before prisoners were exposed.

Plaintiffs also allege that the temperature checks and screening of staff, visitors, and prisoners coming into the prison relied on an honor system, which was wholly inadequate to

protect prisoners from infected persons entering the facility.  Under the plan, prison officials who did not want to be sent home without pay failed to report their possible exposures.  Defendants provided no fail-safe plan for officers who were less than honest, including using rapid antigen testing.  Defendants thereby allowed openly sick officers to enter, relying only on temperature checks and once-weekly swab testing.

Plaintiffs complain that, in the absence of rapid antigen testing, Officer Baker was allowed to enter the facility for 10 days—5 to 7 days after her last test and 3 days before her positive result was returned—despite the fact that she was evidencing symptoms, such as coughing, sneezing, and sniffling.  She was only required to leave the facility once her result came back.  In addition, despite the fact that Prisoner Counselor (PC) McDowell's wife was ill with COVID-19, PC McDowell did not isolate, but instead worked at the facility for a week until his test came back positive.  Similarly, Plaintiff Wise observed Correctional Officer Ogle come into the unit while noticeably sick with COVID-19 symptoms.  Plaintiffs complain that Defendants allowed numerous officers, including both second-shift housing unit officers on H-Unit, to come into the facility while the officers were sick and until they received their positive results back on November 17, 2020.

Under MDOC Director's Office Memorandum (DOM) 2020-30R4, issued on August 10, 2020, Defendants Washington and Yukins are the only persons authorized to approve transfer of prisoners during the pandemic.  On October 28, 2020, Defendants Washington and/or Yukins transferred nine prisoners from the Marquette Branch Prison (MBP) to KCF.  The transferred prisoners had received positive test results on October 8, 2020, and they were held in isolation at MBP until their transfer.  Upon arrival at KCF, the transferred prisoners were placed in isolation in the KCF visiting room.  KCF prisoners became extremely concerned about the

3

transferred prisoners, to the extent that, on October 31, 2020, Defendant Warden Brown met with prisoners in each unit to explain that he had been forced to take the MBP prisoners by his superiors in Lansing, but he intended to keep them in the visiting room until they tested negative for the virus. Defendant Brown repeatedly denied that the prisoners were COVID-19-positive. Brown stated that the prisoners had tested negative at both MBP and KCF. (*See, e.g.,* Burkett Aff., ECF No. 3-4, PageID.141.) Nevertheless, on October 31, MBP prisoner Kimble was transferred into H-Unit, 1-side, bunk 31. Prison authorities instructed Kimble and other MBP prisoners were told not to discuss their COVID-19-positive status with other prisoners. Within days of Kimble's placement in his new cubicle, the entire cubicle was put in isolation for possible exposure to the virus. Plaintiffs allege that, by transferring the MBP prisoners to KCF, Defendants Washington and Yukins demonstrated deliberate indifference to the risk of Plaintiffs contracting COVID-19.

According to the allegations of the amended complaint and the attached affidavits, Plaintiff Good had multiple and lengthy exposures to a prisoner who was housed in the same unit with prisoner Kimble, and he also had repeated contacts with PC McDowell in early November, including on November 6, 2020. On the evening of November 7, 2020, Plaintiff experienced the first symptoms of COVID-19, and his worst coughing occurred from November 8 to 9, 2020. Plaintiff alleges that he was diagnosed with COVID-19 as a result of a swab test on November 18, 2020, conducted by nurse Jeri McMahon.[1] Plaintiff complains that, although Defendants could not have known that he would test positive for the disease on November 18, they placed a COVID-positive prisoner in the bunk above Plaintiff on that date. Plaintiff alleges that he had preexisting long-term damage to his heart and lungs from a triple by-pass and lung damage, and he claims to

---

[1] Plaintiff Good and other Plaintiffs complain that Nurse McMahon conducted all swab testing without changing her gloves between prisoners.

4

have long-term damage to his lungs, including burning and inflammation, caused by COVID-19. He has been issued an Albuterol inhaler.

Plaintiff Robinson has the underlying condition of sarcoidosis, a lung disease, and he repeatedly reminded staff in H-Unit of the risk posed to him by COVID-19-positive prisoners. Nevertheless, on October 31, 2020, prisoner Kimble was moved into the same cubicle as Plaintiff Robinson.  Plaintiff Robinson was tested for COVID-19 on an unstated date when the occupants of his cubicle were placed in isolation in the visiting room.  He tested negative, and he was returned to his unit.  Five days later, Plaintiff Robinson was again isolated in the pavilion, due to a positive test result and worsening symptoms.  Plaintiff Robinson complains that he suffered chills, fever, coughing, nausea, and labored breathing.  He nevertheless was kept in the pavilion, which was virtually unheated, and he was denied a sufficient number of thin blankets.  Plaintiff Robinson alleges that he periodically would pass out from exhaustion and would wake from the unending bright lights.  Once H-Unit was quarantined, Plaintiff Robinson returned to the unit.  His lung condition became sufficiently severe that he was taken to War Memorial Hospital by ambulance. He was placed on supplemental oxygen and intravenous fluids.  He remained in the hospital for 10 days.  Since that time, he has suffered lingering damage to his lungs, shortness of breath, and a feeling of suffocation.

Plaintiff Danford was housed in H-Unit, and he routinely associated with individuals from E-Unit, including prisoners Goliday and Pratt, who were some of the first to be quarantined after testing positive.  Those prisoners had regular association with Correctional Officer Baker, who was allowed to work while symptomatic with COVID-19.  On October 31, 2020, Plaintiff Danford saw prisoner Kimble be embraced by other prisoners after his placement on the unit.  Kimble never wore a mask and used common phones, kiosks, and Jpay machines.

Danford also was exposed to PC McDowell prior to McDowell's positive diagnosis. On November 14, 2020, Plaintiff Danford began to experience COVID-19 symptoms, but his concerns were dismissed by health care staff. Plaintiff claims that officials were aware that his medication, Methotrexate, compromised his immune system, increasing his risk.

In October 2020, numerous officers attended a retirement party at which at least one person was positive for COVID-19. Plaintiff Minnie learned that Officer Baker had tested positive. Days later, nine MBP prisoners transferred into the facility. Plaintiff Minnie complains that Defendant Brown falsely represented that MBP prisoners would be kept away from KCF prisoners. However, Brown placed at least one MBP prisoner, Richard Kimble, into H-Unit. Plaintiff Minnie spoke with Kimble before learning that Kimble had tested positive. Once Plaintiff Robinson was isolated the first time, Plaintiff Minnie realized that Kimble was in Robinson's cubicle. Plaintiffs Minnie and Robinson worked together on their porter jobs. Plaintiff Minnie also came into contact with PC McDowell during the first week of November 2020, shortly after McDowell had begun to cough and exhibit other COVID-19 symptoms. On November 12, 2020, Plaintiff began to experience COVID-19 symptoms, including terrible headache, nausea, loss of smell and taste, body aches, exhaustion, shortness of breath, and pain in his chest. The shortness of breath, exhaustion, and pain in his chest have been long-term symptoms.

Plaintiff Wise was approached by prisoner Kimble on November 5, 2020, after Kimble had been declared to have tested negative. Plaintiff Wise spent 30 minutes with Kimble, giving him a haircut. Wise learned of Kimble's COVID-19-positive status on November 15, 2020. On November 5, Wise also entered the office of PC McDowell to inquire about an inaccurate disbursement rejection. When Wise entered the office, Defendant McDowell fumbled to put on his mask. Plaintiff Wise learned of McDowell's COVID-19-positive status on November 15,

6

2020, when he was told that McDowell had not come to work the prior Friday due to his positive status.  In addition, Plaintiff Wise worked with Trinity Nelson, who was unknowingly exposed to Officer Headly when Headly had COVID-19.  Plaintiff Wise participated in the mass testing of H-Unit prisoners on November 16, 2020.  Later that evening, Wise began to experience powerful headaches and back pain.  By the following day, he had chills.  He later experienced cramping in his feet and hands.  He experienced labored breathing and burning lungs when he attempted to exercise.

Plaintiff Burkett had a number of conversations with prisoner Kimble, during which Burkett learned that Kimble had tested positive for the virus at both MBP and KCF but had been told by staff not to talk about his positive status.  Burkett was called back to H-Unit on November 3, 2020, due to information that the school principal, with whom Burkett worked closely, had tested positive.  Later that day, Plaintiff went to McDowell's office, finding McDowell with his mask lowered and coughing, though McDowell raised the mask again.  The following day, Plaintiff Burkett had to go to McDowell's office again for a signature.  Plaintiff was tested for the virus on November 16, and it came back positive.  Between November 23 and December 6, 2020, Burkett suffered terrible headaches, body aches, shortness of breath, lower back pain, brown urine, blood in his urine, diarrhea, nausea, night sweats, fatigue, and dizziness.

Plaintiff Jordan alleges that he was exposed to prisoner Kimble after Kimble came into the unit on October 31, because Kimble never wore a mask and used the same phones, microwaves, and kiosks, and touched the same tables, showers, and toilets.  Plaintiff Jordan also went into McDowell's office for a signature on November 9, 2020.  Plaintiff Jordan was tested on November 16, and he saw the nurse fail to change her gloves between prisoners.  Plaintiff learned that he tested positive for the virus on November 20, 2020.  Jordan had unspecified symptoms.

Plaintiffs seek preliminary injunctive relief, alleging that they have learned that Defendants intend to retaliate against them for filing grievances and the instant lawsuit by transferring them to a more restrictive facility.  They contend that such transfers would prevent them from being able to communicate directly and force them to send their documents through the institutional mail service.  They allege that such transmissions would increase their difficulty in meeting deadlines, interfere with the exercise of their First Amendment rights by exposing their allegations and arguments to scrutiny by correctional officers, prevent them from obtaining witnesses, and increase the cost of their litigation.

## II.   Severance

All Plaintiffs presently reside at MBP.  Federal Rule of Civil Procedure 20(a)(1) identifies the circumstances where Plaintiffs may join together and raise their claims in one action:

> (A) [if] they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) [if] any question of law or fact common to all plaintiffs will arise in the action.

Fed. R. Civ. P. 20(a)(1).  It appears that the joinder of Plaintiffs' claims here would be permitted under the rules.

However, although Plaintiffs' claims may be permissibly joined under Rule 20, there are ample reasons to sever the claims of multiple prisoner-plaintiffs who are proceeding *in pro per*.  In *Proctor v. Applegate*, 661 F. Supp. 2d 743 (E.D. Mich. 2009), the United States District Court for the Eastern District of Michigan set out those reasons:

> In *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724 (1966), the Supreme Court held that "[u]nder the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."  Consistent with this policy, the requirements prescribed by Rule 20(a) are to be liberally construed in the interest of convenience and judicial economy.  *Swan v. Ray*, 293 F.3d 1252, 1253 (11th Cir. 2002).  The undersigned suggests, however, that plaintiffs, especially

prisoners, do not have free reign to join multiple claims and defendants in any manner they choose.  As the New Jersey District Court recently observed, "the policy of liberal application of Rule 20 is not a license to join unrelated claims and defendants in one lawsuit."  *Boretsky v. Corzine*, 2008 WL 2512916, *4 (D.N.J. 2008), citing, *Pruden v. SCI Camp Hill*, 252 F. App'x 436 (3d Cir. 2007); *George v. Smith*, 507 F.3d 605 (7th Cir. 2007); *Coughlin, supra*.  And, Rule 20 does not authorize a plaintiff to "incorporate into an existing action a different action against different parties and presenting entirely different factual and legal issues." *Lovelace v. Lee*, 2007 WL 3069660, *1 (W.D. Va. 2007), quoting, *Trail Realty Inc. v. Beckett*, 462 F.2d 396, 399–400 (10th Cir. 1972).

The New Jersey District Court also discussed the pervasive impracticalities associated with multiple-plaintiff prisoner litigation, which militates against permissive joinder even if it were otherwise allowed by Rule 20(a).  *Boretsky*, at *5. Among the difficulties noted are the "need for each plaintiff to sign every pleading, and the consequent possibilities that documents may be changed as they are circulated, or that prisoners may seek to compel prison authorities to permit them to gather to discuss the joint litigation."  *Id*.  A Wisconsin federal court also found that permitting multiple prisoner-plaintiffs to proceed in a single action invites violations of Rule 11(a), which requires every pleading to be signed by all pro se plaintiffs.  *Ghashiyah v. Frank*, 2008 WL 680203, *1 (E.D. Wis. 2008).  Moreover, it often results in pleadings being filed on behalf of plaintiffs without their consent. *Id*.

Some courts have also noted that "jail populations are notably transitory, making joint litigation difficult."  *Boretsky*, at *5, citing, *White v. Tennessee Bd. of Probation and Paroles*, 2007 WL 1309402 (W.D. Tenn. 2007) ("[I]t is administratively impractical to permit five inmates at three institutions to litigate their claims in a single action").  Other District Courts have also pointed to the "need for resolution of individualized questions of fact and law surrounding the requirement for exhaustion of administrative remedies under 42 U.S.C. § 1997e(a)."  *Boretsky*, at *6, citing, *Worthen v. Oklahoma Dept. of Corrections*, 2007 WL 4563665 (W.D. Okla. 2007) (Report and Recommendation), Report and Recommendation adopted in pertinent part, 2007 WL 4563644 (W.D. Okla. 2007); *Lilly v. Ozmint*, 2007 WL 2022190 (D.S.C. 2007).

The *Boretsky* court found the reasoning of these other District Courts to be persuasive, noting that prisoners are "not in the same situation as non-prisoner joint plaintiffs; prisoners' circumstances make joint litigation exceptionally difficult." *Boretsky*, at *6.  The court concluded, however, that it would "not be just to dismiss this case in its entirety merely because the co-plaintiffs' claims may not be joined." *Id*.  Instead, pursuant to Rule 21, the court dismissed all plaintiffs except the first named plaintiff[] and directed the Clerk of the Court to open a separate case for each dismissed plaintiff, docketing the original complaint and the court's opinion and order in all the newly severed cases.  Each plaintiff was also granted leave to file an amended complaint asserting his individual claims.  *Id*.

*Proctor*, 661 F. Supp. 2d at 779–81.

This Court has experienced many of the described difficulties that follow from permitting multiple plaintiffs to proceed in *pro per* in a single litigation.  No matter how efficient joinder may appear at the beginning of a case, prisoner-plaintiffs frequently are unable to provide pleadings signed by all parties as required by the Fed. R. Civ. P. 11(a) ("Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's individual name—or by a party personally if the party is unrepresented."); when prisoners are transferred, they are never able to do so.  Motions are proposed or opposed by one but not all plaintiffs leaving the Court to puzzle out who is seeking relief against whom and on whose behalf.

It is well established that *pro se* litigants lack standing to represent the interests of others.  *See Newsom v. Norris*, 888 F.2d 371, 381 (6th Cir. 1989) (citing *McGowan v. State of Maryland*, 366 U.S. 420, 429 (1961)); *Raines v. Goedde*, No. 92-3120, 1992 WL 188120, at *2 (6th Cir. Aug. 6, 1992).  Moreover, Federal law specifies that cases in the courts of the United States may be conducted only by the parties personally or through counsel.  28 U.S.C. § 1654. That statute provides that, "in all courts of the United States, the parties may plead and conduct *their own cases* personally or by counsel, as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."  28 U.S.C. § 1654 (emphasis added).  The federal courts long have held that § 1654 preserves a party's right to proceed *pro se*, but only with respect to their own claims.  Only a licensed attorney may represent other persons.  *See Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201–03 (1993); *United States v. 9.19 Acres of Land*, 416 F.2d 1244, 1245 (6th Cir. 1969).

Where Plaintiffs find themselves housed at different facilities, permitting Plaintiffs to proceed in a joint action unquestionably will result in motions filed by only one Plaintiff, which

would fail to meet the requirement of Rule 11(a) of the Federal Rules of Civil Procedure.  *Id.*  In the interests of justice, therefore, the Court directs the Clerk to sever the claims of the seven Plaintiffs into separate actions.  Plaintiff Good may proceed under the existing case number.  The Clerk shall open a new case for the claims of each of the remaining Plaintiffs.  The pleadings filed to date in the instant case shall appear in the docket of each case.

The Western District of Michigan has several rules designed to have related or cognate cases assigned to a single judge.  *See* W.D. Mich. LCivR. 3.3.1(d) and 3.3.2.  Assigning related or cognate cases promotes judicial economy.  The seven cases that will result from the severance of Plaintiffs' claims are related cases under the Local Rules.

Finally, to ensure that each case goes forward with only the claims of a single Plaintiff, each Plaintiff shall file an amended complaint containing only the allegations relevant to that Plaintiff's claims for relief.  If Plaintiffs wish to proceed with their respective actions, each must carefully fill out the form and submit it to the Court.

The Court directs the Clerk to send to each Plaintiff a copy of the form complaint under 42 U.S.C. § 1983 for a civil action by a person in state custody, together with a copy of the docket sheet for that Plaintiff's new action.  Each Plaintiff shall submit an amended complaint by filing his complaint on the requisite form within twenty-eight (28) days from the date of entry of this order.  The amended complaint will take the place of the original complaint, so it must include all of the Defendants that each Plaintiff intends to sue and all of the claims that each Plaintiff intends to raise.  Plaintiffs need not re-submit supporting exhibits filed with the original complaint.  The case number assigned to each Plaintiff's case must appear on the front page of the amended complaint.  If any Plaintiff fails to submit an amended complaint in proper form within the time allowed, the Court may dismiss the complaint without prejudice.

III.     **Preliminary Injunctive Relief**

Plaintiffs move for a temporary restraining order and subsequent preliminary injunction barring their transfer to another facility and other retaliation.

Preliminary injunctions are "'one of the most drastic tools in the arsenal of judicial remedies.'"  *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)).   The issuance of preliminary injunctive relief is committed to the discretion of the district court.  *See Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000).  In exercising that discretion, a court must consider whether a plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction.  *Nader*, 230 F.3d at 834.  These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also S. Galzer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) ("[T]hese are factors to be balanced, not prerequisites to be met."); *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013) (same); *Ne. Ohio Coal.*, 467 F.3d at 1009 (same); *Nader*, 230 F.3d at 834 (same).  "But even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'"  *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).  Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting.  *See Glover v. Johnson*, 855 F.2d 277, 286 (6th Cir. 1988); *Kendrick v. Bland*, 740

12

F.2d 432, 438 & n.3 (6th Cir. 1984).  The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances.  *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).  Preliminary injunctions are not favored, and a movant is not necessarily entitled to such relief, even if the movant has shown likelihood of success on the merits.  *Benisek v. Lamone*, ___ U.S. ___, 138 S. Ct. 1942, 1943–44 (2018).

Under controlling Sixth Circuit authority, Plaintiffs' "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his section 1983 action.  *NAACP v. Mansfield*, 866 F.2d 162, 167 (6th Cir. 1989).  Plaintiffs have not made such a showing.  It is not at all clear from the amended complaint or attachments that Plaintiffs have a substantial likelihood of success on their Eighth Amendment claims.  Although the Court makes no final determination on this issue, it appears at this preliminary stage that Plaintiffs have not met the first required showing.

Second, the presence of irreparable harm is not evident.  A plaintiff's harm from the denial of a preliminary injunction is irreparable only if it is not fully compensable by monetary damages.  *See Overstreet*, 305 F.3d at 578.  Since filing their initial motion, the case has proceeded without incident.  There is no evidence that Defendants have engaged in any of the activities from which Plaintiffs seek to restrain them.  Moreover, given the Court's conclusion that Plaintiffs' claims must be severed into separate complaints, Plaintiffs cannot demonstrate an immediate, concrete and irreparable harm in the absence of an injunction.

Finally, the interests of identifiable third parties and the public at large weigh against an injunction.  Decisions concerning prison security are vested in prison officials, in the

13

absence of a constitutional violation.  Any interference by the federal courts in the administration of state prisons is necessarily disruptive.  The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights.  *See Glover*, 855 F.2d at 286-87.  That showing has not been made here. Accordingly, Plaintiffs' requests for preliminary relief will be denied.

Accordingly,

**IT IS ORDERED** that Plaintiffs' requests for preliminary injunctive relief (ECF Nos. 1, 20) are **DENIED**.

**IT IS FURTHER ORDERED** that the claims of each Plaintiff shall be severed from those of the other Plaintiffs.  Plaintiff Good's claims shall proceed under this case number. The Clerk is directed to open a new case for the claims of each remaining Plaintiff.  The seven cases are related within the meaning of Western District of Michigan Local Civil Rule 3.3.1(d).

**IT IS FURTHER ORDERED** that the Clerk is directed to send to each Plaintiff a copy of the form complaint under 42 U.S.C. § 1983 for a civil action by a person in state custody, together with a docket sheet of that Plaintiff's case.  Each Plaintiff shall submit an amended complaint by filing his complaint on the requisite form within twenty-eight (28) days from the date of entry of this order.  The amended complaint will take the place of the original complaint, so it must include all of the Defendants that each Plaintiff intends to sue and all of the claims that each Plaintiff intends to raise.  If any Plaintiff fails to submit an amended complaint in proper form within the time allowed, the Court may dismiss that Plaintiff's complaint without prejudice.

Dated:   June 15, 2021                              /s/ Hala Y. Jarbou
                                                    HALA Y. JARBOU
                                                    UNITED STATES DISTRICT JUDGE

14